## IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CONFERENCE ARCHIVES, INC., )
          Plaintiff, )
  )
   v. )   Civil NO. 3:2006-76
  )
SOUND IMAGES, INC., )   JUDGE GIBSON
          Defendant. )

## MEMORANDUM AND ORDER

**GIBSON, J.**

Web sites and other electronic media present a new frontier for the protection of intellectual property rights. While protection of source code and other technological processes have found refuge in copyright or patent law, protection of the "look and feel" of a web site remains unclear. In this matter, a case of first impression in this Circuit, the Court will address this issue.

This matter came before this Court when Defendant filed a Notice of Removal from Court of Common Pleas of Cambria County (Document No. 1). This case presents two questions: first, whether Defendant breached the parties' Non-Disclosure Agreement ("NDA") by copying the "look and feel" of the Plaintiff's product; and second, whether copying the "look and feel" of the Plaintiff's product violated various intellectual property protections. Plaintiff filed a motion for partial summary judgment (Doc. No. 82). Defendant filed a motion for summary judgment (Document No. 86). The Court grants in part and denies in part the Defendant's motion, and denies the Plaintiff's motion.

## FACTS

The facts are largely uncontroverted. Plaintiff, Conference Archives, Inc., and Defendant, Sound Images, Inc., record and reproduce conferences and other meetings through different digital media, including interactive CD-ROMs and streaming Internet video. Plaintiff developed a product called Conference Companion and registered that name as a federal trademark. Conference Companion displays recorded video in a web page within an Internet browser. Plaintiff's Brief in Support of Motion for Summary Judgment (PBSMSJ) p. 2. In September 2003, Plaintiff and Defendant entered into a Non-Disclosure Agreement ("NDA") to facilitate collaboration between the two parties. The NDA is reproduced as Appendix A of Plaintiff's Statement of Undisputed Material Facts (PSUMF). The purpose of the NDA was to preserve confidentiality while allowing each party "access to sufficient information to effect the business purposes reasonably intended by each of them." *Id.*

The companies enjoyed a partnership until a breakdown in relationships in late 2004. Following the breakdown, in or about January 2005, Defendant copied a portion of code from Conference Companion in order to develop a new product, which aimed to emulate Conference Companion. PSUMF ¶ 5-6. The Defendant concedes copying the code in order for its product to have a "consistent" appearance to those previously produced by the Plaintiff. Programmers for the Defendant chose to "mimic" the "look and feel" of Plaintiff's product. PSUMF ¶ 14-15. Plaintiff did not authorize the Defendant's copying of the code. PSUMF ¶ 7.

## ANALYSIS

### I.    Standard for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure sets forth the standard for summary judgment. Summary judgment should be granted in favor of the movant where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." The burden is on the movant to show that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A material fact is one "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. In reviewing the summary judgment record, the Court must "view the facts in the light most favorable to the nonmoving party." *Andreoli v. Gates*, 482 F.3d 641, 647 (3d Cir. 2007).

### II.    Defendant Did Not Violate the NDA

The Court will first consider the claim of whether Defendant violated the NDA. Plaintiff contends that the Defendant violated the NDA by copying code from the Plaintiff's web site. Section three of the NDA provides that "without prior written consent of the Disclosing Party, neither the Receiving Party nor its Representatives shall use any Confidential Information except in furtherance of the specific business purposes of any joint venture or similar business arrangement between the two of them." Thus, any information that is "Confidential" will be protected by the NDA. Plaintiff contends that the code Defendant copied is confidential. Defendant counters that the information is not confidential. The NDA by its express terms does

not apply to "information generally available to the public." The court determines that because the code in question is "information generally available to the public," the NDA provides no remedy, and the Plaintiff fails to state a claim on breach of contract grounds.

*A.     The NDA Imposes a Duty to Protect "Confidential Information"*

A successful cause of action for breach of contract requires that the Plaintiff establish: "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages." *Gorski v. Smith*, 812 A.2d 683, 692 (Pa. Supp. 2002). It is undisputed that the NDA constituted a valid contract that provided terms to govern the relations between the parties. Further, the Plaintiff asserts that it was damaged as a result of Defendant copying the code. Therefore, the only remaining issue is whether a duty imposed by the NDA was in fact breached. The Defendant could only have breached the NDA if the terms imposed a duty not to copy the code. The court now considers the duties imposed by the NDA.

The language of the contract was duly considered by both parties. As the Plaintiff concedes, the NDA "was not [an] afterthought," and was "signed by both parties" after discussion. PMSJ p. 2. The Plaintiff "produced" the NDA and "required [the Defendant] to sign it." *Id. Contra proferentem* contracts should be interpreted against the interests of the party that imposed it. In this case, as the Plaintiff authored the NDA and required the Defendant to sign it, any ambiguous provisions should inure to the benefit of the Defendant.

In order to assess whether the NDA imposes on the Defendant a duty not to copy the code, the code must fall within the category of "confidential information." Section 2.b of the NDA provides that "Confidential information shall not include (i) information *generally available to the public*, conferencing, seminar and meeting related industries ...." When the

4

intent of the contracting parties can clearly be ascertained, the court's role is to give effect to this meaning. *Amerisourcebergen Drug Corp. v. American Associated Druggists, Inc.*, 2008 WL 248933 (E.D.Pa. 2008) citing *Murphy v. Duquesne Univ. of the Holy Ghost*, 565 Pa. 571, 577 (Pa. 2001) ("The fundamental rule in interpreting the meaning of a contract is to ascertain and give effect to the intent of the contracting parties"). This language clearly spells out that information generally available to the public, should not receive the protections of confidentiality. If the information is generally available to the public, it does not receive protections from the NDA.

> B.    *The Copied HTML Code Is Not Confidential Information and Is Not Protected By the NDA*

The crux of this contract claim depends on whether the code written in the Hyper Text Markup Language (HTML) is "available to the public." If it is publicly available, it is not confidential information, and thus not protected. If the HTML code is not publicly available, it is covered by the NDA, and protected. The reasoning of *Amerisourcebergen Drug Corp. v. American Associated Druggists, Inc.* is instructive. In that case, the parties signed a confidentiality agreement that excluded "certain types of information from the definition of 'Confidential Information' set out in § 1, including information that is generally available to the public; information that becomes *generally available to the public*, other than as a result of the breach of the [Confidentiality Agreement]; and information that [Defendant] can establish it already possessed, developed independently, or received from a third party." *Id.* In considering whether the Defendant violated the confidentiality agreement, the Court considered whether the information produced, e-mails in this case, was in fact unavailable to the public.

In the case *sub judice*, Plaintiff freely distributed the Conference Companion CD-ROM to the public at no cost, including conferencing, seminar, and meeting-related industries. Once an individual possesses the CD-ROM, obtaining the HTML code is straightforward. HTML code consists of "textual instructions that instruct the browser how to display a certain page, and is written in human readable, plain English." DMSJ Exhibit 2, Deposition of Todd Wonders, at pp. 46-47. The Conference Companion CD-ROM is made up primarily of HTML code, which is "completely human readable text" and not machine code. *Id.* at pp. 41-42. In most Internet Browsers, by selecting the "View Source" option, one can instantly view all of the HTML code on a web site. DMSJ p. 6-7. While machine code is hidden, and requires reverse engineering to be read, HTML code is "open for all the world to read." *Id.* Defendant did not copy any of the hidden machine code underlying the Conference Companion software. Rather, Defendant merely copied the HTML code that is available to the entire world to instantly view.

The court finds that the HTML code in the Conference Companion software was "generally available to the public" within the meaning of the NDA, and is not confidential information. Plaintiff fails to state a claim on which relief can be granted, as the HTML code in question does not qualify for protection under the NDA based on any plausible reading of the agreement, and the nature of the code copied.

III.    **Intellectual Property Protection for the "Look and Feel" of a Web Site**

The Plaintiff's motion for summary judgment is nebulous as to what ground of intellectual property law it relies on. It refers to "theft of trade secrets." PMSJ 1. Elsewhere, the Plaintiff refers to the case as a copyright matter. The brief mentions that "'copying' is generally a matter provided (in, for example, copyright cases)," *id.* at 6, and "unlike many copyright cases,

6

no circumstantial evidence of access to the protected work . . . is necessary to reach a conclusion [in this case] that copying occurred." *Id.* at 8. Further, the Plaintiff discusses that "copyright case law provides a helpful analogy." *Id.* But later the Plaintiff acknowledges that "this is not a copyright case" yet argues that "copyright caselaw [still] contradicts what appears to the [Defendant's] defense." *Id.* at 10. In a footnote, the Plaintiff reiterates that "this is a breach of contract case, and not a copyright or trademark case per se, although the analogy to these areas of the law were [*sic*] explored in greater detail infra." *Id.* at 2, n. 2.

Elsewhere, Plaintiff uses more general terms, and references "piracy of [Plaintiff's] intellectual property," *id.* at 4, "technological identity theft," *id.* at 5 n. 7, "outright piracy," *id.* at 7, and "intellectual property had been stolen." *Id.* Later, Plaintiff writes that the "look and feel" of a web site can be "protected in multiple ways, such as by copyrights, trademark, [and] tradedress [*sic*]." Based on this last statement, in connection with the rest of the brief, and with regard to Defendant's Motion for Summary Judgment, construing the facts in favor of the non-moving party, the Court will consider the Plaintiff's claim under the doctrines of trade secret law, copyright law, trademark and trade dress law.

## IV.    The "Look and Feel" of a Web Site

The notion of "look and feel" traces its roots to copyright and trademark.[1] Recently, several courts have considered the "look and feel" of web sites, though the courts refer to this concept in varying ways.[2] In different cases, courts have referred to this concept as the "total

---

[1] In copyright, the concept has been limited in application. *See* Melville B. Nimmer & David Nimmer, 4 Nimmer on Copyright §13.03[A][1][c] (Matthew Bender & Company Inc., 2007).

[2] *See Tufenkian Import/Export Ventures Inc. v. Einstein Moomjy Inc.*, 338 F.3d 127, 133 (2d Cir. 2003) (looking at the "total concept and overall feel" as part of the analysis for inexact copies); *Int'l Union, Local 150 v. Team 150 Party Inc.*, 88 U.S.P.Q.2d (BNA) 1532 (N.D. Ill. Sept. 5, 2008) (denying a motion to dismiss a claim of infringement based on a registration that purportedly included the "look and feel" of Web sites); *QSRSOFT Inc. v.*

7

concept and feel,"[3] the "overall impression,"[4] and the "total feel." *Blue Nile Inc. v. Ice.com Inc.*, 478 F. Supp. 2d 1240, 1241-42 (W.D. Wash. 2007). The Court will refer to this concept as the "look and feel."

### A.    The Technical Elements of the "Look and Feel" of a Web Site

Before dissecting the "look and feel' of a web site, the Court will first discuss three technical elements that determine how a web site appears: colors, orientation, and code elements.

### 1.    Color

Think back to your elementary school art class. By mixing different amounts of red, green, and blue paint—the primary colors—you could create any color. Colors on computers work in the same fashion. On computer displays, colors are formed by combining varying concentrations of red, green, and blue. In order for the computer to accurately recreate the color, the concentrations of red, green, and blue colors are each translated to a number between 0 and 255, with 0 representing the least intensity (dullest color), and 255 representing the most intensity (brightest color). Computers translate the number (from 0-255), which is in decimal notation (base 10), into hexadecimal notation (base 16).[5]

"Hexadecimal notation has sixteen characters, the numbers 0-9 and the letters A-F, wherein A represents 10, B represents 11, C represents 12, D represents 13, E represents 14, and F represents 15." *In re Alappat*, 33 F.3d 1526, 1538 (Fed. Cir. 1994). The decimal value of 0

---

*Rest. Tech. Inc.*, 2006 U.S. Dist. LEXIS 76120 (N.D. Ill. Oct. 19, 2006) (considering preliminary injunction where Defendant stole Plaintiff's software and "look and feel" of its new main page looked like Plaintiff's).
[3] *See* 4 Nimmer on Copyright §13.03[A][1][c].
[4] Fred H. Perkins, Alvin C. Lin, *What's Old Is New In Web Site Protection*, 7 No. 3 Internet L. & Strategy 3 (March 2009).
[5] Andrew Johnson-Laird, *Software Reverse Engineering In The Real World* 19 U. Dayton L. Rev. 843, 868 (1994) ("Hexadecimal is base 16 arithmetic (from the Greek and Latin, hex and decim").

corresponds to the hexadecimal value of 00, and the decimal value of 255 corresponds to the hexadecimal value of FF. The three colors (red, green, and blue), are each represented by a two-character hexadecimal notation. These three hexadecimal notions are combined to form a six character string known as a "hex triplet." The hex triplet is preceded by the "#" symbol. For example, a greyish-blue color would be represented by #2468A0. This hex triplet consists of a value of red of 36 (24 in hexadecimal), a value of green of 104 (68 in hexadecimal), and a value of blue of 160 (A0 in hexadecimal). These three values combine to form #2468A0.

When considering similar colors between two works, it is not enough to say that both works use a "navy blue" or "dark grey" color. Rather, using the hexadecimal values allows the Court to consider, with a high degree of certainty, the similarity of different elements. There are over $256^3$ (256 x 256 x 256) possible unique color value hex triplets, or 16,777,216 unique colors to be precise.[6] While some colors are more common than others, if two products utilize the same exact hex triplet, there is a likelihood that the color was copied.

2.    Orientation

On a computer screen, the size of elements is measured in a unit known as the pixel. A pixel is a single point on the screen. To put this amount in perspective, a common size, or resolution of computer monitors, is 1,280 pixels in width, and 1,024 pixels in height. All images, tables, and other elements on a web site are similarly measured in pixels. Further, elements are laid out, or oriented on the screen, based on measurements in pixels. For example, an image may be 10 pixels down from the top of the page, and 50 pixels over from the left side of the page.

---

[6] *See* Martin Smith, *Hexadecimal Color Theory*, available at http://www.ehow.com/about_5452316_hexadecimal-color-theory.html.

When considering the size and orientation of elements of the "look and feel" of a web site, the pixel is the relevant unit of measurement.

### 3.    Code Elements

Web sites are generally designed in a markup language known as Hyper Text Markup Language (HTML). Elements on the page, such as images, tables, or text are defined by HTML "tags." A tag is usually a keyword placed between two angle brackets, that instructs the Internet browser how to display the relevant element. For example, in order to add an image element, a programmer would add an image tag, indicated by <img>.  To add a table element, a programmer would add a table tag, indicated by the <table> markup. While HTML code is invisible to the end user surfing the web, the manner in which the code and tags are arranged directly impact how the page looks and feels.

### B.    Case Law Considering the "Look and Feel" of Web Sites

The leading case dealing with trade dress infringement for the "look and feel" of web sites is *Blue Nile, Inc. v. Ice.com, Inc.* 478 F. Supp. 2d 1240 (W.D. Wash. 2007). In this case, Blue Nile, Inc., an online diamond retailer, developed a web site that allowed users to select and purchase diamonds based on certain factors, including the cost, quality, and size of the stone. Blue Nile sued Ice.com, alleging that Defendant copied elements of the Blue Nile web site that were protected by the Copyright Act. Blue Nile further alleged that Defendant copied the "look and feel" of the Plaintiff's site, in violation of the Plaintiff's trade dress under § 1125(a) of Lanham Act. Based on the face of the complaint, the court was unable to resolve the matter because it could not determine whether an "adequate remedy" existed for the copyright claims. If an "adequate remedy" existed, the trade dress claims would have to be dismissed. Therefore

given the "novelty of the Plaintiff's trade dress claim," the court requested "greater factual development." The case subsequently settled outside of court.

In *Faegre & Benson LLP v. Prudy*, 367 F.Supp.2d 1238, 1244 (D.Minn. 2004), the Plaintiff asserted that the Defendant's "counterfeit web pages" infringed on their trade dress, and featured "the same color scheme, layout, buttons, fonts, and graphics," and the "overall impression . . . is dominated by the substantial incorporation of" the Plaintiff's design. Defendant countered that the similar elements were parodies. *Id.* To resolve the inquiry of trade dress infringement between the Plaintiff and Defendant's web site, the Court concluded that the "overall dissimilarity" of the Defendant's page "creates a low likelihood of confusion." *Id.* at 1244. The Plaintiff's web site advertised his legal services. The Defendant's web site offered graphic images of aborted fetuses. The court found that these pages "are not similar to or related to any content or design on [Plaintiff's] official web page, or to the content or design that a consumer would be likely to expect to find on a law firm web site." *Id.* Furthermore, that "each web page contains a clear parody disclaimer stating "Critical Faegre Website Parody" decisively eliminates any possible risk of confusion. The Court concluded that because "Purdy's web sites are not likely to cause confusion among consumers, the Court determines that his use of Faegre's trade dress does not constitute trade dress infringement and is not in violation of the Court's Order." *Id.* at 1245.

*SG Services Inc. v. God's Girls Inc.*, 2007 WL 2315437 (C.D. Cal. May 9, 2007), presented the question whether the Defendant copying the look and feel of the Plaintiff's web site constituted trade dress infringement. Plaintiff complained that the Defendant copied several features from its web site, including the use of the color pink and several phrases. However,

11

because the Plaintiff failed to provide an adequate record to document the copying, the Court had to rely on the limited evidence in the Defendant's motion.

Following the three-part analysis to determine trade dress infringement under the Lanham Act, the Court considered the distinctiveness, functionality, and likelihood of confusion of the web site. The court found that the Plaintiff did not prove that the look and feel of the site was distinctive. The "true test" for distinctiveness is whether the look and feel causes the public to associate the look and feel of the web site with the Plaintiff's web site. *Id.* at *10. The Court imposed a high burden to prove distinctiveness, and considered whether survey evidence demonstrated that a significant percentage of people surveyed associated the look and feel of the Plaintiff's web site with the Plaintiff. *SG Servs. Inc.*, 2007 WL 2315437, at *10 (*citing Clicks Billiards*, 251 F.3d 1252 (9th Cir. 2001) (testamentary evidence from witnesses showing that the Defendant's copying of the Plaintiff's site was intentional would also weigh heavily in the Plaintiff's favor)). With respect to functionality, the Court found that the color and phrases the Defendant copied were not functional, as the features were "merely adornment" and did not "constitute the actual benefit that the consumer wishes to purchase." *SG Servs. Inc.*, 2007 WL 2315437, at *8 (citation omitted).

Finally, with respect to likelihood of confusion, the court in *SG Services* did not find that the Defendant's use of colors would generate confusion. While the Plaintiff's web site used the color pink throughout the page, the Defendant's web site was predominantly blue, and only used pink as an accent. *Id.* at *10. As a result, the Court granted summary judgment for the Defendant, and did not find an infringement of trade dress. *Id.* at *11. While this case is

12

instructive, it fails to establish general rules to determine when copying a web site violates trade dress, largely due to the insufficient record Plaintiff provided to support its arguments.

In an unpublished opinion from the District of New Jersey, Judge Wolfson considered a case where the Defendant copied portions of the Plaintiff's web site. *Mortg. Mkt. Guide, LLC v. Freedman Report, LLC*, 2008 U.S. Dist. LEXIS 56871, *106 (D.N.J. 2008). Mortgage Marketing Group (MMG), developed a web site that displayed various visuals to discuss the bond market, including "the featured securities, current pricing, changes from benchmark times, Japanese candlestick charts, stochastics, trend lines, moving averages, support and resistance, charting time periods, printing ability and options [which] all serve particular functions." *Id.* All of these visuals were inextricably linked to their function. A hallmark of trade dress protection is nonfunctionality. Therefore, the court found that these visuals were not protected by trade dress. Rather, due to their creativity and "unique expression," the Court found that they were entitled to copyright protection.[7] Rather than copying the total impression of a site, the Defendant in this New Jersey case copied actual functioning features, which were protectable by the Copyright Act. *Id.* at *135-36. Had the Plaintiff merely copied visual elements, the copyright act would not apply, and a trade dress remedy may have been viable. Thus, this case from the Third Circuit does not resolve whether the "look and feel" of a web site can be protected by trade dress.

Beyond the sparse case law, the academy has developed a growing body of literature discussing whether the "look and feel" of a web site should be protected as a trade secret under

---

[7] *Mortg. Mkt. Guide, LLC v. Freedman Report, LLC*, 2008 U.S. Dist. LEXIS 56871, *106 (D.N.J. 2008) ("The unique customization options that MMG provides in its bond page combined with its selection and arrangement of such options is protectable under the copyright laws. The number of ways to express each particular financial analysis tool may be limited, but their selection and arrangement into a unique and customizable way to provide financial analysis of the mortgage market is a unique expression. Therefore, the Court rejects Defendants' argument that the idea of providing financial analysis of the mortgage market merges with the unique expression of providing such analysis through specific types of tables, charts, and customization tools.")

the Lanham Act. These articles provide insight into the nature of web sites, and how they differ from traditional media.[8] They also shed light on defining the "look and feel" of a web site. One article characterized the "look and feel" as "including all of the visual or graphic elements and features that contribute to the site's overall impression or 'gestalt.'"[9] Another article notes the "total look and feel of a Web site includes the visual screen display and the command buttons or icons used for navigating the site."[10] A different author indicates that the look and feel of a Web site may include, "the distinctive use of text, graphics, colors, sounds and/or movements."[11]

A different concept of trade dress finds that it "create[s] a distinctive look and feel, while provoking subliminal and subconscious associations with the source of the goods or services offered on the website."[12] Further, to receive protection, the design must be so "arbitrary that 'one can assume without proof that [the trade dress] automatically will be perceived . . . as an identifier of the source of the product.'"[13] A unique interface that contains, for example, an "elaborate border or motif that is consistently used throughout the site, even though the site's

---

[8] Fred H. Perkins, Alvin C. Lin, *What's Old Is New In Web Site Protection*, 7 No. 3 Internet L. & Strategy 3 (March 2009) ("The interactive nature of Web sites is another important difference. Web pages are not just static pages; rather, the text, photos, images, and layout and design may depend on the manner in which the site is used. It may be difficult to define the elements that are eligible for protection.").

[9] *Id.*

[10] Lisa M. Byerly, *Look And Feel Protection Of Web Site User Interfaces: Copyright Or Trade Dress?*, 14 Santa Clara Computer & High Tech. L.J. 221, 250-251 (1998).

[11] 1 Internet Law and Practice § 13:10, Internet Law and Practice Database updated July 2009, International Contributors, Part IV. Intellectual Property Issues, Chapter 13. Trademark Infringement and Unfair Competition. *See also* www.alsb.org/Proceedings%20Files/2001/Saunders.pdf *TRADESITE OR WEB DRESS?: TRADE DRESS PROTECTION FOR WEBSITE INTERFACES by Kurt M. Saunders (*"The most significant identifying feature of a website is its design and appearance of the user interface, composed of such features as frames, logos, typefonts, windows, menus, buttons, and pictorial and graphic representations.").

[12] J. Scott Anderson, *PAINSTAKING SEMANTICS: SELECTING WEBSITE TRADE DRESS ELEMENTS TO SURVIVE A COPYRIGHT*, 7 John Marshall Review Intellectual Property Law Review 97, 115 (2007).

[13] Lisa M. Byerly, Look And Feel Protection Of Web Site User Interfaces: Copyright Or Trade Dress?, 14 Santa Clara Computer & High Tech. L.J. 221, 253 (1998).

information is changed and updated, would likely qualify for trade dress protection."[14] No Court has adopted any of these definitions.

## V.    Plaintiff Fails to State a Claim Under Trade Secret Law

Plaintiff begins its summary judgment brief by asserting that "this is a . . . theft of trade secrets case involving a specialized computer program written by the lead software designer for Plaintiff." PBSMSJ p. 1. At no point in the brief does the Plaintiff address why Conference Companion should be treated as a trade secret. The court finds that the HTML code which Defendant copied does not warrant trade secret protection because the code was not secret, and alternatively Plaintiff did not take the requisite steps to keep it secret.

In federal courts, trade secret claims are controlled by state law. *S.I. Handling Systems, Inc. v. Heisley*, 753 F.2d 1244, 1255 (3d Cir. 1985). The controlling statute under Pennsylvania law is Pennsylvania's Uniform Trade Secret Law (PUTSL). 12 Pa. Const. Stat. A. §§ 5301-5308. A trade secret is information that "[d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use." 12 Pa. Const. Stat. § 5302 (2007). Further, the owner of the information must take "efforts that are reasonable under the circumstances to maintain its secrecy." *Id.*

Under Pennsylvania law, factors to be considered in determining whether given information is a trade secret are: (1) the extent to which the information is known outside of the owner's business; (2) the extent to which it is known by employees and others involved in the owner's business; (3) the extent of measures taken by the owner to guard the secrecy of the

---

[14] *Id.* at 258.

15

information; (4) the value of the information to the owner and to his competitors; (5) the amount of effort or money expended by the owner in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *Youtie v. Macy's Retail Holding, Inc.*, 2009 WL 1578043 (E.D. Pa. June 5, 2009).

First, the information was known outside of the owner's business, due to the fact that Plaintiff freely distributed and sold the files to conference attendees. Any secrecy the information may have once possessed was destroyed after its distribution. The distribution constitutes a public disclosure and defeats any claims for trade secrets. *Midland-Ross Corp v. Sunbeam Equip. Corp.*, 316 F.Supp. 171, 177 (W.D. Pa. 1970). Second, due to the collaborative agreement Plaintiff and Defendant signed, employees outside the Plaintiff's business certainly had access to the information. Third, Plaintiff placed no restrictions on who could view the HTML. They did not attempt to encrypt the information, and the code was easily accessible. DMSJ Ex. 2, Deposition of Todd Wonders, at pp. 41-42. Fourth, the value of the information is questionable. Plaintiff did not adequately establish the nature of its damages.

Fifth, while the Conference Companion software is an elaborate computer program, the HTML code in question is relatively simple, and Defendant's expert acknowledged that he was able to recreate the code in a few days. This fact suggests that the amount of effort to develop the information is minimal. The sixth, and most dispositive factor, is that the information can be copied with great ease. In most Internet Browsers, by selecting the "View Source" option, one can instantly view all of the HTML code in a few seconds, and copy the code. *See* DMSJ 6-7. Because this information is so easy to duplicate, and the Plaintiff took no measures to prevent its dissemination, the HTML code cannot be protected under trade secret law. Considering these

factors, the Court finds that the HTML code Defendant copied cannot be considered a trade secret. The Court grants Defendant's Motion for Summary Judgment with respect to the trade secret claim.

## VI.      The Intersection of Copyright Protection and Trade Dress Protection

The Constitution grants Congress the enumerated power to make all laws necessary and proper to "promote the progress of science and useful arts, by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries." U.S. Constitution, Article I, §8. The protection of intellectual property stands as one of the bedrock principles of our Constitution.[15] In the context of protecting the "look and feel" of a web site, two possible intellectual property doctrines exist: the Copyright Act, to protect copyrights, and the Lanham Act, to protect trade dresses.

Historically, trade dresses were easy to describe as items were static and unchanging. Such concepts as a brown wrapper, or a purple pill, are easily reducible to descriptive terms. In contrast, web sites are dynamic, interactive, and engaging. They frequently change, yet they retain certain common elements. The Internet is simply different. One standard to define this appearance has been termed the "look and feel." Before defining the look and feel, the Court must first resolve the question of whether it should be protected by the Copyright Act or trade dress protection. To resolve this question, the Court must first determine whether the "look and feel" of a web site fails within the subject matter of the Copyright Act. If the "look and feel" of a

---

[15] THE FEDERALIST No. 43 (James Madison) (Praising the "science and useful arts" clause, writing that "The utility of this power will scarcely be questioned. The copyright of authors has been solemnly adjudged, in Great Britain, to be a right of common law.").

web site is copyrightable, the Copyright Act preempts any claim under the Lanham Act. No court in this Circuit has ever directly resolved this issue.

### A.    *Copyright Protection*

The hallmark of copyright protection is originality. The Copyright Act grants copyright protection for "original works of authorship fixed in any tangible medium of expression," including "pictoral, graphic, and sculptural works." 17 U.S.C. § 102(a)(5). The *"sine qua non* of copyright is originality," and all works must be original in order to receive copyright protection. *Feist Publications, Inc. v. Rural Telephone Serv. Co., Inc.*, 499 U.S. 340, 345 (1991). The Supreme Court has recognized that in order to be "original," the work in question must have been "independently created by the author (as opposed to copied from other works)," and it must "possess[] at least some minimal degree of creativity." *Id.* A work can "make the grade quite easily" as long as "it possesses some creative spark." *Id.* The copyright act requires a low threshold level of creativity. *Darden v. Peters*, 488 F.3d 277, 286 (4th Cir. 2007).

When determining whether a copyright should be granted on grounds of originality, the Register of Copyrights must determine if the submitted material "constitutes copyrightable subject matter." 17 U.S.C. § 410(a). Some works lack the "minimum level of creativity and do not qualify for copyright protection." *Darden*, 488 F.3d at 286. This "narrow category of works in which the creative spark is utterly lacking or so trivial as to be virtually nonexistent" are outside the subject matter of copyrightable material. *Feist*, 499 U.S. at 359. The Copyright Office provides a non-exhaustive list of works that fail to meet the minimum level of creativity; "[w]ords and short phrases such as names, titles, and slogans; familiar symbols or designs; mere

18

variations of typographic ornamentation, lettering or coloring; mere listing of ingredients or contents." 37 C.F.R. § 202.1(a).

The Register examines applications for registration to determine if "the material deposited constitutes copyrightable subject matter and . . . the other legal and formal requirements of [the Copyright Act] have been met." 17 U.S.C. § 410(a). If the application constitutes copyrightable subject matter, then the Register must issue a certificate of registration to the applicant. *Id.* If the Register determines that "the material deposited does not constitute copyrightable subject matter or that the claim is invalid for any other reason," then the Register must refuse registration and notify the applicant of the reasons for refusal. *Id.* The scope of "copyrightable subject matter" is defined by a list of protected forms of expression found in 17 U.S.C.§ 102.[16] If an item is not within this list, it is not considered copyrightable subject matter.

The "substantial similarity" standard is used to determine whether one work infringes upon another. The standard for finding an infringement of copyright is important, as protection for intellectual property "is only as strong as the potential for enforcing the protection against a wrongdoer."[17] The substantial similarity test only requires circumstantial evidence that the infringer had access to the material in order to copy it, or if there is direct evidence the infringer copied the material.[18] Due to the ease with which users can view web sites, proving access is not

---

[16] 17 U.S.C. § 102. ("(a) Copyright protection subsists, in accordance with this title, in original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. Works of authorship include the following categories: (1) literary works; (2) musical works, including any accompanying words; (3) dramatic works, including any accompanying music; (4) pantomimes and choreographic works; (5) pictorial, graphic, and sculptural works; (6) motion pictures and other audiovisual works; (7) sound recordings; and (8) architectural works.").

[17] Lisa M. Byerly, *Look And Feel Protection Of Web Site User Interfaces: Copyright Or Trade Dress?*, 14 Santa Clara Computer & High Tech. L.J. 221, 234 (1998).

[18] *Id.*

19

a difficult task. The greatest obstacle to obtaining relief from the Copyright Act to protect the look and feel of a web site will be proving originality.[19]

B.    *Trade Dress Protection and the Lanham Act*

While the Copyright Act aims to protect original work, trademark and trade dress protection apply to any communication that conveys meaning, even if unoriginal. Trade dress is a form of trademark protection that refers to the "total image and overall appearance of a product." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 764-65 n. 1 (1992) (*quoting Blue Bell Bio-Medic al v. Cin-Bad, Inc.*, 865 F.2d 1253, 1256 (5th Cir. 1989)). A creator does not need to register a trade dress under §43(a) of the Lanham Act to qualify for protection as an unregistered trade dress. 15 U.S.C.§1125. Protection for distinct trade dress allows consumers to reasonably assume that products that appear similar are in fact from the same provider. If consumers can be misled by confusingly similar trade dresses, consumers may be led to make misinformed decisions. Trade dress law encourages designers to invest in the "good will" generated by their products, so as to link a specific dress to a specific product, and minimize consumer confusion.[20] This "good will" encourages producers to create products of high quality, and this benefits society. *Landscape Forms, Inc. v. Columbia Cascade Co.*, 940 F. Supp. 663, 666-667 (S.D.N.Y. 1996) (quoting *Smith v. Chanel, Inc.*, 402 F.2d 562, 566 (9th Cir. 1968) ("If such confusion occurs, meaningful competition is frustrated because '[w]ithout some...method of product identification, informed consumer choice, and hence meaningful competition in equality, could not exist."')).

---

[19] *Id.* at 235.

[20] Lisa M. Byerly, *Look And Feel Protection Of Web Site User Interfaces: Copyright Or Trade Dress?*, 14 Santa Clara Computer & High Tech. L.J. 221, 248 (1998). *See* also, J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition§ 2.10 (3d ed. 1996).

Trade dress refers to the "manner in which the goods or services are presented to prospective purchasers . . ." to indicate the creator of the dress. Restatement (Third) of Unfair Competition §16 cmt. a (1995). A trade dress includes the "arrangement of identifying characteristics or decoration connected to a product, whether by packaging or otherwise, intended to make the source of the product distinguishable from another and to promote it for sale." *Ferrari S.P.A. Esercizio Fabriche Automobili E Corse v. Roberts*, 944 F.2d 1235, 1239 (6th Cir. 1991). In *Qualitex Co. v. Jacobson Products Co., Inc.*, 514 U.S. 159, 162 (1995), the Supreme Court held that the Lanham Act defines the items that can qualify for trademark protection "in the broadest of terms." *See* 15 U.S.C. § 1127. People might use "almost anything at all that is capable of carrying meaning" as a "symbol" or "device" to define trademarks in the Lanham Act. *Id.* Trade dress may include "features such as size, shape, color or color combinations, texture, graphics, or even particular sales techniques." *John J. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 980 (11th Cir. 1983). By necessity, the definition of trade dress is broad, and is "essentially [a business's] total image and overall appearance." *Blue Bell*, 864 F.2d at 1256.

Courts have found that the décor of a restaurant, *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S 763, 765 (1992) (décor being described as "a festive eating atmosphere having interior dining and patio areas decorated with artifacts, bright colors, paintings and murals. The patio includes interior and exterior areas with the interior patio capable of being sealed off from the outside patio by overhead garage doors. The stepped exterior of the building is a festive and vivid color scheme using top border paint and neon stripes. Bright awnings and umbrellas continue the theme."), the color and shape of pill capsules, *Ciba-Geigy Corp. v. Bolar Pharmaceutical Co.*, 547 F.Supp. 1095 (D.N.J. 1982), *aff'd per curiam*, 719 F.2d. 56 (3d Cir.

1983), *cert. denied*, 465 U.S. 1080 (1984) (blue/white and pink/white opaque colors and use of a capsule shape as opposed to tablets protected), the look of a greeting card line, *Roulo v. Russ Berrie & Co., Inc.*, 886 F.2d 931 (7th Cir. 1989), *cert. denied*, 493 U.S. 1075 (1990), the design and format of magazine covers, *Time Inc. v. Globe Communications Corp.*, 712 F.Supp. 1103 (S.D.N.Y. 1989), the shape of physical features on a briefcase, *Ventura Travelware v. A to Z Luggage*, 1 U.S.P.Q. 2d 1552 (E.D.N.Y. 1986), and the layout of a kiosk display, *Butterick Co. v. McCall Pattern Co.*, 222 U.S.P.Q. 314, 317 (S.D.N.Y. 1984) are all protectable trade dresses.

Trade dress protection is substantially broader than copyright protection, yet provides less enforcement. The Supreme Court recognized the parallel role of these two intellectual property protections, and noted that there is no difference between a word trademark and a visual trade dress, except for the fact that a trademark may be expressed orally, while a trade dress must be seen. *See Two Pesos*, 505 U.S 763 (1992). In the same sense that words protected by a trademark create a semantic impression, appearances protected by a trade dress create a visual impression.

C.      *Copyright Preemption and the Lanham Act*

Section 301(a) of the Copyright Act preempts all claims that may arise under state common law or other statutory grounds.[21] On its face, § 301(a) does not limit remedies under other federal statutes. However, "courts have long limited application of the Lanham Act so as not to encroach on [federal] copyright interests."[22] If a court finds that copyright laws "provide[] an adequate remedy," any remedy under the Lanham Act is preempted. *Dastar Corp. v.*

---

[21] *See* 17 U.S.C. § 301(a) ("Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State."). Madison presaged the need for a federal standard of Copyright Law in Federalist No. 43, observing, "The right to useful inventions seems with equal reason to belong to the inventors. The public good fully coincides in both cases with the claims of individuals. The States cannot separately make effectual provisions for either of the cases, and most of them have anticipated the decision of this point, by laws passed at the instance of Congress."

[22] 1 Nimmer on Copyright § 1.01[D][2] at 1-83.

22

*Twentieth Century Fox Film Corp.*, 539 U.S. 23, 34 (2003) ("Thus, in construing the Lanham Act, we have been careful to caution against misuse or over-extension of trademark and related protections into areas traditionally occupied by patent or copyright.") (internal quotation omitted).

Claims for copyright infringement under the Copyright Act, and claims for Trade Dress Infringement under the Lanham Act are mutually exclusive. A Plaintiff cannot receive a remedy for both. If an adequate remedy exists for the Copyright Act, no remedy lies for the Lanham Act claim. If a work was granted copyright registration, this serves as strong evidence that the subject matter falls within the Copyright Act, and cannot be protected by trade dress.[23] In order for a designer's creation to receive trade dress protection, it must survive a copyright preemption challenge. In order to withstand preemption, "the trade dress elements must be specifically identified and painstakingly selected."[24]

## VII.    Plaintiff Fails to State a Claim That Defendant Violated the Copyright Act

The high standard of proving originality under the Copyright Act, in the context of web sites, was discussed in an Eastern District of New York case. *Crown Awards, Inc. v. Trophy Depot*, 2003 WL 22208409 (E.D.N.Y. Sept. 3, 2003). In this case, Plaintiff asserted copyright protection for: various elements of its web site, including (1) the "product line tabs at the top of the page"; (2) the three-frame website design with a thumbnail image of the catalog; and (3) the specific text of the website. *Id.* at *12. The Court rejected this claim, finding that the look and feel of the web site, including the tabs, the three-frame design, and the text, were insufficient to constitute an "original" copyrightable work. *Id.* at *13. In *Crown Awards*, the court identified the difficulty

---

[23] *See generally* 2 Nimmer on Copyright § 7.16 (discussing the significance of copyright registration).

[24] J. Scott Anderson, *PAINSTAKING SEMANTICS: SELECTING WEBSITE TRADE DRESS ELEMENTS TO SURVIVE A COPYRIGHT*, 7 John Marshall Review Intellectual Property Law Review 97, 111 (2007).

of creating original Internet content, and found "The mere use of a three frame design, the use of a small picture of the catalogue on the upper right side and the use of promotional language ... are insufficient to create an 'original' compilation of elements that forms the basis for copyright protection." *Id.* at *13. Though the court found similarities, "the similarity derives from unprotectable elements." *Id.* at *15.

In a footnote in *Blue Nile*, a leading case dealing with protecting the "look and feel" of a web site, the Court addressed the issue of whether the "look and feel" of a web site is copyrightable. The court noted that "the Copyright Office and at least one author have commented that copyright protection may *not* cover the overall format, or the *look and feel*, of a website." *Blue Nile Inc. v. Ice.com Inc.*, 478 F. Supp. 2d 1240, 12444 n. 4 (W.D. Wash. 2007). The court cited *Darden*, which agreed with a Copyright Office's examiner that "'protection for the overall format of a web page is inconsistent with copyrightability.'" *Darden*, 402 F. Supp. 2d 638, 644 (E.D.N.C. 2005).

At trial, Darden alleged that the "look and feel" of his web site should be protected under the Copyright Act. The District Court rejected this claim. On appeal, Darden argued that "the special combination of font and color selection; visual effects such as relief, shadowing, and shading; labeling; and call-outs" on his web site revealed his "creative efforts," and warranted copyright protection. In a decision which was subsequent to the holding in *Blue Nile*, the Fourth Circuit affirmed the trial court's ruling. *Darden v. Peters*, 488 F.3d 277, 281 (4th Cir. 2007).

The Fourth Circuit, granting deference to the finding of the Copyright Examiner Officer the Conference Archive's product . . . A small portion of the HTML us*ed* in Sound Images' CD-rejecting Darden's claim, the Copyright Office noted that a website may well contain

24

copyrightable elements, but its format and layout is not registrable."). The court, assuming a "discretionary standard," found that the work did not meet the "minimum standard of originality for a copyright claim." *Id.* at 286. While certain elements of a web site would clearly fall within the subject matter of copyright, including the text of the page, software code, and certain creative graphical elements,[25] the elements that create the look and feel of a web site may "fall completely outside the subject matter of the Copyright Act and, thus, escape preemption."[26]

Proving the originality of the look and feel of a web site could be difficult, as Internet pages are "straightforward or just simplistic presentations of information."[27] Simplistic web sites "may lack highly creative, visual graphics and, instead, contain mostly functional elements used for navigating through the information on the site."[28] They often just "arrange facts or information" and may lack the "originality required for copyright protection."[29] Under the merger doctrine, if "there are only a few alternatives available for creating the design of a Web site, such that the idea merges with the expression, copyright protection will not be extended to that expression."[30]

In this case, considering the factors set forth in *Crown Awards*, *Blue Nile*, and *Darden*, the "look and feel" of the Plaintiff's web site should not receive protection under the Copyright Act.

---

[25] J. Scott Anderson, *PAINSTAKING SEMANTICS: SELECTING WEBSITE TRADE DRESS ELEMENTS TO SURVIVE A COPYRIGHT*, 7 John Marshall Review of Intellectual Property Law 97, 114 (2007) ("The subject matter cases illustrate the need to clearly identify and define the exact web content for which trade dress protection is being sought. Along a spectrum of possible trade dress elements, original text most clearly falls within the subject matter of copyright because it may be protected as a literary work. Control elements such as the software code and underlying controls may also be protected as literary works. Original and creative graphics elements may be protected by copyright as a pictorial or graphic work.").

[26] *Id.*

[27] Lisa M. Byerly, LOOK AND FEEL PROTECTION OF WEB SITE USER INTERFACES: COPYRIGHT OR TRADE DRESS? 14 Santa Clara Computer & High Tech. L.J. 221, 231-32 (1998).

[28] *Id.* at 233.

[29] *Id.*

[30] *Id. See Apple Computer, Inc. v. Microsoft Corp.*, 799 F.Supp. 1006, 1021 (N.D. Cal. 1992) (explaining merger doctrine). *See also* 17 U.S.C.A. § 102(b).

25

While individual elements of the Conference Companion web site may receive copyright protection, the web site as a whole is beyond the scope of the subject matter of the Copyright Act. In fact, the three elements identified in *Crown Awards* bear great similarity to the items allegedly copied by Defendant from Conference Companion. As in *Crown Awards*, these elements are not protected by the Copyright Act. Because the "look and feel" is not copyrightable, Plaintiff fails to state a claim on which relief can be granted with respect to a claim under the Copyright Act. And because the "look and feel" of the web site does not receive protection under the Copyright Act, the Copyright Act does not preempt the Lanham Act claim. Thus, a violation of the Lanham Act is possible.

## VIII.    Plaintiff States a Claim That Defendant Violated the Plaintiff's Trade Dress

While the Plaintiff registered the name "Conference Companion" as a federal trademark, there is no evidence that Defendant infringed on that trademark. Thus, Plaintiff fails to state a claim on trademark grounds. However, the Plaintiff states a claim on which relief can be granted with respect to a trade dress claim under the Lanham Act, and Defendant's Motion for Summary Judgment on this count is denied.

### A.    The "Look and Feel" of a Web Site Can Constitute a Trade Dress

This issue of whether the "look and feel" of a web site should receive trade dress protection under the Lanham Act presents a case of first impression for this Circuit. Considering a web site through the lens of copyright law allows the courts to ignore certain intangible elements. Focusing on the look and feel of a web site through the prism of trade dress suits

allows courts to protect these attributes.[31] Further, a "look and feel" analysis is suited to protect not only static elements such as "photos, colors, borders, or frames," but also "interactive elements and the overall mood, style or impression of the site."[32]

Despite several attempts from the courts and the academy, the "look and feel" of a trade dress remains a nebulous concept, largely due to the novelty of this technology. All of these explanations aim to answer the same question: How does a web site look *and* feel? Yet courts treat these two concepts as an amalgamation. It may be helpful to consider "look" and "feel" as separate elements in order to explore the contours of this dynamic concept. The "look" comprises aspects of a web site's design including the colors, shapes, layouts, typecases, and shapes. While the "look" can be readily understood under existing trade dress doctrines, the "feel" presents a new wrinkle.

A web site is conceptually different from traditional print media. It is useful to visualize a web site user interface not as a static presentation, but rather as a series of overlapping layers aimed at accomplishing specific tasks.[33] At the most concrete level is the "visual design," which is the graphic treatment or interface elements. This layer represents the "look" in the "look and feel." Below the "visual design" is the "interface design," which facilitates user interaction with functionality. The information in this layer facilitates the user's understanding and interaction with the page. This would represent the "feel" in the "look and feel." The "feel" corresponds to

---

[31] Fred H. Perkins, Alvin C. Lin, *What's Old Is New In Web Site Protection*, 7 No. 3 Internet L. & Strategy 3 (March 2009) ("Articulating claims in terms of the "total look and feel" of a site may prove an effective way to keep a court from overlooking its intangible elements. When faced with a situation where the essence of a client's Web site has been copied - but few, if any, traditionally protectable features - one should consider pleading a claim under copyright, trade dress and/or common law unfair competition where the critical part of the claim is that the overall "look and feel" of the site has been wrongly usurped to the client's detriment.").

[32] *Id.*

[33] This model is adapted from Andrew Sears & Julie A. Jacko, *The Human-Computer Interaction Handbook: Fundamentals, Evolving Technologies and Emerging Applications*, Second Edition p. 900 (2007).

certain dynamic navigation elements, including buttons, boxes, menus, and hyperlinks. These intangible and interactive elements contribute to the feel. The feel can also consist of the "information design of a web site, including the . . . location of common elements such as navigation elements."[34] According to this model, the two critical layers to consider when defining the "look and feel" are the "visual design" and the "interface design." These two elements combined "encompass not only static elements such as particular photos, colors, borders or frames, but also interactive elements and the overall mood, style or impression of the site."[35]

A consistent "look and feel" will "allow[] users to develop an intuitive model for using" a web site.[36] The intuitiveness of a web site allows users to rely on the predictability of the design when they need to utilize the web site; "the intuitive model helps users learn new functions and transactions more quickly and easily."[37] A major goal of product design is to develop "cognitive absorption," defined as a "state of deep involvement . . . exhibited through temporal dissociation, focused immersion, heightened enjoyment, control and curiosity."[38] An emotional response to a visual design, commonly known as an "affect, is a complex interaction of immediate reactions modulated by experience with previous situations and cognitive predictions of future states."[39]

---

[34] *See* Web Site Look & Feel: Overview, Massachusetts Institute of Technology Administrative Computing Developers Resources, available at http://web.mit.edu/ist/org/admincomputing/dev/ws_webstand.shtml.

[35] Fred H. Perkins, Alvin C. Lin, *What's Old Is New In Web Site Protection*, 7 No. 3 Internet L. & Strategy 3 (March 2009).

[36] *See* Web Site Look & Feel: Overview, Massachusetts Institute of Technology Administrative Computing Developers Resources, available at http://web.mit.edu/ist/org/admincomputing/dev/ws_webstand.shtml.

[37] *Id.*

[38] Andrew Sears & Julie A. Jacko, *The Human-Computer Interaction Handbook: Fundamentals, Evolving Technologies and Emerging Applications, Second Edition* p. 901 (2007).

[39] *Id.* ("a user's immediate and reflexive affect reaction to [information technology] has a positive impact on his or her consequence cognition oriented evaluations of the [technology].")

Combined, the "look" and "feel" coalesce to form a protectable virtual experience that provides the user with "cognitive absorption"; a graphical user interface that facilitates the development of an intuitive engagement. This interface promotes the efficient, predictable, and reliable use of a web site. The hallmark of a protectable "look and feel" trade dress is a graphical user interface that promotes the intuitive use of the web site.

In many respects, trade dress protection, which focuses on the likelihood of consumer confusion, is better suited to protect Web site user interfaces, than copyright law, which merely considers the similarities between two types of expression.[40] "Focusing on a site's overall 'look and feel' provides the court with greater flexibility to fashion the scope of protection needed to shield a Plaintiff from a 'careful' infringer who has wrongly imitated the 'essence' of a Web site without copying its specific traditionally protectable elements."[41] Where the design of a web site cannot meet the strictures of copyright protection, the trade dress protection, as applied to the "look and feel" aims to adapt to the evolving nature of intellectual property rights on the Internet.

The intuitive value of "look and feel" undergirds many of the purposes of trade dress law.[42] First, the "look and feel" of a web site aims to support and protect a firm's reputation. Like the famed Coca-Cola classic dynamic ribbon, or the iconic Apple logo, on the Internet, the appearance of a web site is essential to a firm's standing in the market. The simple layout of Google's home page, the listing of tweets on Twitter.com, or the organization of photographs

---

[40] Lisa M. Byerly, Look And Feel Protection Of Web Site User Interfaces: Copyright Or Trade Dress?, 14 Santa Clara Computer & High Tech. L.J. 221, 248 (1998).

[41] Fred H. Perkins, Alvin C. Lin, *What's Old Is New In Web Site Protection*, 7 No. 3 Internet L. & Strategy 3 (March 2009).

[42] Mitchell M. Wong, *The Aesthetic Functionality Doctrine And The Law Of Trade-Dress Protection*, 83 Cornell L. Rev. 1116, 1123 (1998) ("First, trademark law attempts to protect a firm's reputation. Second, trademark law protects firms from unjust enrichment by imitators. Third, trademark law facilitates meaningful consumer choice in the market. Last, trademark law encourages the production of high-quality products").

and status updates on Facebook.com are all integral to the recognition of their brands, and consequently the firm's reputation. When a person visits a web site, she is comforted by the distinctive design, knowing that the look and feel is clearly associated with a specific brand name. This branding facilitates the association with a firm's reputation.

Second, protecting the "look and feel" of a web site prevents imitators from receiving unjust enrichment. The allure of copying, and expropriating the "look and feel" on the web site is appealing. Copying HTML code, which is viewable by anyone, is facile. And, because the Internet is so large, programmers can be somewhat confident that their copying will likely go unnoticed. An infringing programmer unjustly enriches herself by expropriating the cognitive absorption and intuitive properties of the creator's design. Rather than investing the work and effort in developing and marketing a new design, the copier simply aims to tag onto the hard work of another. Providing some teeth to trade dress protection will limit the ability of imitators to receive unjust enrichment.

Third, by shifting the incentives to create, protecting the "look and feel" of a web site encourages producers to develop high quality products. Why would a programmer invest the requisite time, effort, and skill into the design of an exemplar web site when a competitor could merely expropriate the "look and feel"? Unless a programmer had actually infringed on protected copyrighted or trademarked material, this action would likely leave the original creator without a remedy. This protection cuts to the heart of rewards for innovation and ingenuity. Considering a web site's "look and feel" allows the court to protect the intellectual property from a "careful infringer" who has merely copied the "essence" of a Web Site without copying elements

protectable by copyright law.[43] For these reasons, the Court finds that the "look and feel" of a web site can constitute a trade dress, protected by the Lanham Act.

### B.    Standard for Trade Dress Protection

If a work is protected by trade dress, and can survive copyright preemption, the designer has "a lower burden of proof required to establish trade dress infringement" as "[p]roving trade dress distinctiveness, non-functionality, and a likelihood of consumer confusion is generally easier than proving copying and substantial similarity between competing works of authorship."[44] Copyright preemption stands as a significant barrier to state a trade dress infringement suit to protect the look and feel of a web site. After bypassing copyright preemption, the claim will still need to identify and select protectable trade dress elements, and plead them with particularity to avoid any overlapping trade dress and copyright claims.[45] In short, "The trademark standard [under the Lanham Act] for infringement is more favorable for protecting Web site interfaces because it focuses on consumer perceptions and market factors-- not the actual creative expression in the site."[46]

The test to establish trade dress infringement requires that the Plaintiff prove that: (1) the trade dress at issue is distinctive and thus indicates the source of the Plaintiff's goods; (2) the

---

[43] Fred H. Perkins, Alvin C. Lin, WHAT'S OLD IS NEW IN WEB SITE PROTECTION 7 NO. 3 Internet L. & Strategy 3, Internet Law & Strategy (March, 2009).

[44] J. Scott Anderson, *Painstaking Semantics: Selecting Website Trade Dress Elements To Survive A Copyright*, 7 John Marshall Review Intellectual Property Law Review 97, 111-12 (2007). *See Insty*Bit, Inc. v. Poly-Tech Indus., Inc.*, 95 F.3d 663, 667 (8th Cir. 1996) (listing elements that must be proven to satisfy trade dress protection under the Lanham Act). *See, e.g., Nichols v. Universal Picture Corp.*, 45 F.2d 119, 121 (2d Cir. 1930) (addressing the question of "whether the part [of the play] taken was 'substantial' and therefore not a 'fair use' of the copyrighted work; it is the same question that arises in the case of any other copyright work").

[45] J. Scott Anderson, *Painstaking Semantics: Selecting Website Trade Dress Elements To Survive A Copyright*, 7 John Marshall Review Intellectual Property Law Review 97 (2007).

[46] Lisa M. Byerly, Look And Feel Protection Of Web Site User Interfaces: Copyright Or Trade Dress?, 14 Santa Clara Computer & High Tech. L.J. 221, 253 (1998).

trade dress is primarily nonfunctional; and (3) the trade dress of competing goods is confusingly similar. Lanham Trade-Mark Act, § 43(a), 15 U.S.C.A. § 1125(a).

      1.    Distinctiveness

Distinctiveness is the "mental association by a substantial segment of consumers and potential consumers between the trade dress in question and the source of that trade dress. *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1354 (9th Cir. 1985). The test for distinctiveness considers several factors: (1) the degree and manner of advertising under the claimed trademark; (2) the length and manner of use of the claimed trademark; (3) whether use of the claimed trademark has been exclusive; (4) evidence of substantial sales, advertising, and promotional activities; (5) any unsolicited media coverage of the product; and (6) any attempts to plagiarize the mark. *First Brands Corp. v. Fred Meyer, Inc.*, 809 F.2d 1378, 1384, n. 6 (9th Cir. 1987).

In order for a web site to be distinct, the site must be either "inherently distinctive or have acquired distinctiveness."[47] The Supreme Court has held that "design, like color is not inherently distinctive." *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 212, (2000). Trade dress protection for a feature of a site will be unavailable if the feature is be merely decorative or aesthetic, as the appearance cannot be said to distinguish one web site from another.

Professor Kurt Sanders suggests that in the context of web sites, the "the issue of distinctiveness will be considered in the aggregate and a court would likely consider the entire layout of the website interface."[48] Further, Saunders remarks that "if a user would recognize the

---

[47] Internet § 13:10 Look and Feel of Web Sites. *See also, Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 212 (2000) (note that product design and color cannot be inherently distinctive and therefore require a showing that they have become distinctive or acquired secondary meaning under 15 U.S.C.A. § 1052(f)).

[48] *See Tradesite Or Web Dress?: Trade Dress Protection For Website Interfaces by Kurt M. Saunders, available at* www.alsb.org/Proceedings%20Files/2001/Saunders.pdf and

source of a website by the unique audiovisual design or its overall combination of features and colors, then that website is distinctive and capable of trade dress protection."[49]

### 2.     Functionality

In order to be protected as a trade dress, the feature the Plaintiff seeks to protect must be nonfunctional. *TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23, 29 (2001). A feature is considered functional if it is "essential to the use or purpose of the product or if it affects the cost or quality of the product, or is the actual benefit that the consumer wishes to purchase." *Id.* In trade dress law, the purpose behind the doctrine of functionality aims to "encourag[e] competition by preventing advances in functional design from being monopolized." *LeSportsac Inc. v. K Mart Corp.*, 754 F.2d 71, 77 (2d Cir. 1985). Concerns about the monopolization are minimized in the context of web sites, as "[h]aving a monopoly on the overall arrangement, i.e., trade dress, of the Web site user interface would not interfere with competition because there would be so many other equally efficient ways to arrange a site."[50]

Today, the competition theory is the primary theory explaining the functionality requirement. This theory has been adopted by the Restatement (Third) of Unfair Competition.[51]

---

http://74.125.93.132/search?q=cache:XwqQfxKyISgJ:www.alsb.org/Proceedings%2520Files/2001/Saunders.pdf+T RADESITE+OR+WEB+DRESS%3F:+TRADE+DRESS+PROTECTION+FOR+WEBSITE+INTERFACES+by+K urt+M.+Saunders&hl=en&gl=us.

[49] *Id.*

[50] Lisa M. Byerly, Look And Feel Protection Of Web Site User Interfaces: Copyright Or Trade Dress?, 14 Santa Clara Computer & High Tech. L.J. 221, 259 (1998).

[51] *See* Restatement (Third) of Unfair Competition § 17 (1995) ("A design is 'functional'... if the design affords benefits in the manufacturing, marketing, or use of the goods or services with which the design is used, apart from any benefits attributed to the design's significance as an indication of source, that are important to effective competition by others and that are not practically available through the use of alternative designs."). Judge Posner endorsed the competition theory, and rejected the competing identification theory, thusly: "[It is an error] to... define nonfunctional as serving primarily to identify the manufacturer. Understood literally, this would mean that if a particular design feature had two equally important purposes, one to please consumers and the other to identify the manufacturer, it would be functional. But a trademark, especially when it is part of the product, rather than being just the brand name, is bound to be selected in part to be pleasing; so this definition of functionality could rule out

If a feature is considered functional, trade dress provides no protection. Similar to distinctiveness, the Supreme Court has held that color is not functional and does not provide a competitive advantage because any color can be used to accomplish a certain functionality. *Qualitex Co. v. Jacobson Products Co., Inc.*, 514 U.S. 159, 165 (1995).

The "look and feel" of a web site can serve several possible functions. First, it can provide "branding, helping to identify a set of products from one company, [and s]econd, it [can] increase[] ease of use, since users will become familiar with how one product functions (looks, reads, etc.) and can translate their experience to other products with the same look and feel."[52] If a "look and feel" becomes functional, it can no longer avail itself of trade dress protection. Thus the look and feel must be distinctive, but nonfunctional. But, the mere presence of functional elements does not by necessity preclude trade dress protection.[53] Rather, a web site may be protectable "as trade dress if the site as a whole identifies its owner as the creator or product source." [54] Third, the look and feel of a page might be functional if it "made viewing the site owner's goods more efficient or facilitated the placing of orders on the owner's site." [55] As long

---

trademark protection for design features . . . [T]he fact that a design feature is attractive does not, to repeat, preclude its being trademarked. If effective competition is possible without copying that feature, then. . . it is not a functional feature." *W.T. Rogers Co. v. Keene*, 778 F.2d 334, 341-43 (7th Cir. 1985).

[52] Look and feel, Wikipedia, available at http://en.wikipedia.org/wiki/Look_and_feel.

[53] *See Tradesite Or Web Dress?: Trade Dress Protection For Website Interfaces by Kurt M. Saunders, available at* www.alsb.org/Proceedings%20Files/2001/Saunders.pdf and http://74.125.93.132/search?q=cache:XwqQfxKyISgJ:www.alsb.org/Proceedings%2520Files/2001/Saunders.pdf+T RADESITE+OR+WEB+DRESS%3F:+TRADE+DRESS+PROTECTION+FOR+WEBSITE+INTERFACES+by+K urt+M.+Saunders&hl=en&gl=us.

[54] *Id.*

[55] Internet § 13:10 Look and Feel of Web Sites.

as there are alternate ways to design a web site, beyond the arrangement protected by the trade dress, the site's interface should not be considered functional.[56]

### 3.    Likelihood of Confusion

In order to determine whether a likelihood of confusion exists between two products, courts generally consider the eight factors enumerated in *Polaroid Corporation v. Polarad Electronics*: (1) the strength of the mark (trade dress); (2) the similarity between the two marks (trade dress); (3) proximity of products in the marketplace; (4) quality and price of Defendant's product; (5) bridging the gap; (6) actual confusion; (7) Defendant's good faith and intent; and (8) sophistication of the buyers. *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961). The Court aims to detect likelihood of confusion, as "it is the subliminal confusion apparent in the record as to the relationship, past and present, between the corporate entities and the products that can transcend the competence of even the most sophisticated consumer." *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway and Sons*, 523 F.2d 1331, 1341. (2nd Cir. 1975). In the context of web sites, the Court can consider the "proximity of the products considered."[57] If the two products are similar in nature and compete with each other, a customer is more likely to be confused if he sees a similar Web Site interface.   As with any

---

[56] Lisa M. Byerly, *Look And Feel Protection Of Web Site User Interfaces: Copyright Or Trade Dress?*, 14 Santa Clara Computer & High Tech. L.J. 221, 260 (1998) ("It is clear that the main concern in granting trademark or trade dress protection is that the protection should not hinder competition. Thus, so long as there are ample options for creating the arrangement of a Web site beyond the particular arrangement choice used by one owner, the site's interface should not be considered functional. Also, as the Internet grows, it is likely that numerous alternatives will be available for creating or building a Web site. Finally, it is unlikely that the arrangement or combination of a Web site user interface would be considered a superior design. While a particular Web site arrangement may be creative or clever, such that it attracts consumers, this quality will not be enough to make the site a so superior in design that competition would severely suffer without public use of the design.").

[57] Lisa M. Byerly, Look and Feel Protection Of Web Site User Interfaces: Copyright Or Trade Dress?, 14 Santa Clara Computer & High Tech. L.J. 221, 262 (1998).

multi-factor balancing test, the court must weigh all of the circumstances in light of the particular facts in this case to assess whether a likelihood of confusion exists.

### C.    Considering the Plaintiff's Trade Dress

The Plaintiff alleges that the "look and feel" of the Conference Companion web site constitutes a look and feel deserving protection under the Lanham act. The Court finds that the Plaintiff states a claim on which relief can be granted for this count. Accordingly, Defendant's motion for summary judgment on this ground will be denied.

### 1.    The "Look and Feel" of Plaintiff's Web site

When comparing the look and feel of the Plaintiff and Defendant's products, it is not particularly helpful to focus on the underlying code in a vacuum. The report of Bruce F. Webster, the Defendant's expert witness, focuses almost entirely on comparing the code and file structure of the two products. Expert Declaration of Bruce F. Webster (Document No. 92-4). While this inquiry would be relevant if the case involved stealing proprietary code, this case centers around the look and feel of a web site. Therefore it is more important to focus on how the code generates the appearance of the program. To that end, much of Mr. Webster's analysis is not relevant.

Mr. Webster conceded that the products were visually similar, and stated that "aside from a *small set of style choices*, there are almost no similarities between Plaintiff's approach . . . and Defendant's approach." Expert Declaration of Bruce F. Webster ¶ 14 (Document 92-4) (emphasis added). The Defendant also remarked "Any similarities between the products fall in either public domain technologies (.html, .jpeg, .pdf, windows media player, etc.) or in

*aesthetics*. The *aesthetic similarities* are the result of an *intentional effort* with what we believed was our partner company." Document 82-3 p. 69 (emphasis added). The Defendant repeatedly admits that Defendant copied the "look and feel" of Plaintiff's product in order to "maintain a consistent appearance" with the Plaintiff's product.[58]

In Exhibit J (Document No. 82-4), Plaintiff provides a comprehensive comparison between the Sound Images Product, the file titled "si_doc," and the Conference Archives Product, the file titled "cai_doc." The comparison breaks down the similarities in five different colored areas in the relevant files: the blue shaded area, the gray shaded area, the orange shaded area, the dark green shaded area, and the yellow shaded area. This extensive record, which spells out in great detail how the products are similar, is very instructive to the Court's analysis.

In the blue shaded area in both documents, the cellpadding (spacing between table cells) of the tables is precisely six pixels, and the height of the first <td> (table column) tag is precisely 318 pixels. Additionally, the font and background colors of this section are identical. Further, the information is placed in the same location, and the <td> and <font> (font element) tags are identical. In the gray shaded area, the table elements in both documents have the same height, 490 pixels. Further, the table tag in both documents has a border color of #000000 (black). In the orange shaded area, the <table> tag in both documents is nearly identical, with the exception of the width of a <td> (table column) tag. The first row in the table in both documents has a

---

[58] Exhibit D. "Maintain a consistent appearance functionality with prior joint CD-ROM product offerings. The consistent appearance in the final product was an effort to maintain our relationship with CAI, and to avoid confusion on the part of our clients. The HTML GUI [Graphical User Interface] generated by this new tool was required to use similar colors and the Microsoft Veranda font as prior products had done. A sample was provided to F&G Technologies by SI of a pre-existing CAI product . . . The content copied represented ONLY THE LOOK AND FEEL (i.e., black background, Veranda font, ext [sic])."

background color of #003366 (navy blue). The second row in the table in both documents contains an empty cell with a background color of #FFFFCC (yellow), and has the same height, 5 pixels. The dark green shaded areas in both documents are "identical" and both use a Cascading Style Sheet (CSS) design element named "sessNav." Plaintiff notes the improbability that the Defendant's product has the element with the exact same name, including the curious capitalization. The yellow shaded areas in both documents are "absolutely identical," as they both contain a thin, yellow line, with a height of exactly 5 pixels, and a color of #FFFFCC (yellow). All of these shaded areas are essential to the navigation of the page, and contribute to the power of the layout to stimulate cognitive absorption and intuitive responses.

### 2.    Willful Copying

What makes this case so unique is the Defendant openly admits it copied the look and feel of the Plaintiff's web site. The Defendant did so in order to confuse the Defendant's customers into thinking the Defendant's web site was similar to the Plaintiff's web site. In other words, Defendant apparently sought to copy the intuitive design of Conference Companion's software, and thus appropriate the "cognitive absorption" properties of the Plaintiff's trade dress. During a deposition, Patricia McLaughlin, an employee of Sound Images, Inc., admitted the goal was to copy the look and feel of the product:

Q: Now, do I interpret that accurately, that what was attempted was that the new product created by the Sound Images Tool would look like the product that Conference Archives had previously put out?
A: Yes.
Q: So the goal was that when a user, for example, a conference attendee, let's say a doctor, would open the product created using the Sound Images tool, that it would look similar to a product that he had been familiar with that had been produced by Conference Archives, is that right?
A: Similar, yes.
Q: Well, in fact the goal was that they appear, to the user, virtually identical, correct?
A: No
Q: Same layout, correct?
A: Blue borders.
Q: Same color scheme, correct?

38

A: Yes.
Q: Same font, correct?
A: [after interchange], So that may be – that may well be correct.
Deposition of Patricia McLaughlin, Appendix B, pp. 44-46 (Document No. 82-3).

The Defendant made numerous statements attesting to intentionally copying the "look and feel":

> Sound Images intended to make its HTML/Javascript based CD-ROM's look to the user like the Conference Archives CD-ROM . . . The Sound Images tool produced CD-ROM's that had a similar color scheme, similar background, similar layout, and similar font to the Conference Archive's product . . . A small portion of the HTML used in Sound Images' CD-ROM's created by CDCT was copied from Conference Companion CD-ROM's . . . Anyone reviewing the Conference Companion CD-ROM's (the disks copied by Sound Images) could review and copy the HTML and Javascript contained therein. Def.'s S. of Undisputed Facts in Supp. of Def.'s Mot. for Summ. J. ¶ 1, 2, 4, 11 (Document No. 88).

> "It is important to note that Sound Images' programmer copied just a tiny portion of the HTML/Javascript contained in the Conference Companion CD. The portions copied represented standard HTML and Javascript text relating to the color and format of the CD's appearance." Brief In Support Of Defendant's Motion For Summary Judgment p. 9 (Document No. 89).

In the Defendant's own statement of facts it remarked that "The Sound Images tool produced CD-ROM's [*sic*] that had a similar color scheme, similar background, similar layout, and similar font to the Conference Archives' product. *See* Exhibit 1, at p. 18:22-25, 19:1." Defendant Sound Images, Inc.'s Responsive Concise Statement of Facts_p. 4. In the words of Todd Wonders, who designed the Plaintiff's product, "The look and feel of SII's products is strikingly similar to the Conference Companion program I created for CAI." Affidavit of Todd Wonders ¶ 20, Document No. 82-3. And the Court is inclined to agree.

What is important to stress, beyond the admission of willful copying, is the reason underlying the choice to copy. Defendant did not simply copy the material because it liked the colors, or thought they were attractive. Defendant copied the material for the express purpose of emulating the Plaintiff's product. Users who were familiar with Plaintiff's product would become immediately familiar with Defendant's product. Rather than memorizing the mark, the

39

consumer would have "a feeling about it from past exposure. That feeling may be vague, even subliminal, but it comes to consciousness when" they navigate the web site. *See Philip Morris Inc. v. Star Tobacco Corp.*, 879 F. Supp. 379, 385 (S.D.N.Y. 1995) (quoting *Londontown Mfg. v. Cable Raincoat Co.*, 371 F. Supp. 1114, 1118 (S.D.N.Y. 1974)). What Defendant sought to expropriate was the intuitive properties ensconced in the Plaintiff's design.

Like the packaging of a product, the look and feel of a web site invites the user in. It offers a familiar interface, with recognizable elements. Similar colors, sizes, and layouts make navigation and interaction facile. The Defendant sought to capitalize on the design work the Plaintiff performed, and copied it for this express purpose. Such willful copying stands in tension with the case law supporting trade dress protection. Plaintiff remarked that it "perceive[s] tremendous value from repeat users' comfort level with the layout of conference companion. CAI sees this layout, and the look and feel thereof, as constituting its 'identity' to conference attendees." Plaintiff's Brief in Support of its Motion for Partial Summary Judgment (Document No. 83) p. 2-3. This "identity" is precisely what the Lanham Act seeks to protect.

The Court finds the Plaintiff states a claim on which relief may be granted with respect to the "look and feel" of the Conference Companion web site. The Court denies Defendant's motion for summary judgment on this ground. The case shall proceed in accordance with this Opinion to determine whether the Defendant infringed this "look and feel."

AND NOW, this 31st day of **March, 2010**, in accordance with the foregoing Memorandum Opinion, IT IS HEREBY ORDERED THAT the Plaintiff's Motion for Summary Judgment (Document No. 82) is **DENIED** and the Defendant's Motion for Summary Judgment (Document No. 86) is **GRANTED** in part and **DENIED** in part.

40

BY THE COURT:

KIM R. GIBSON,
UNITED STATES DISTRICT JUDGE